**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

ERIC PIGRAM,

Plaintiff,

v.

PATRICK T. MORIARTY, et al.

Defendants.

Case No. 24 C 11294

Hon. LaShonda A. Hunt

**MEMORANDUM OPINION AND ORDER**

Plaintiff Eric Pigram brought this civil rights action under 42 U.S.C. § 1983, alleging that he was illegally detained, arrested, held without probable cause, and unlawfully prosecuted in connection with a November 2022 incident involving Chicago Police Department Officers Patrick Moriarty and Michael Belmontez (collectively, the "Individual Defendants"). Plaintiff also asserted state law claims for false arrest/wrongful imprisonment, malicious prosecution, and indemnification against the Individual Defendants and the City of Chicago (collectively, the "Defendants"). Before the Court is Defendants' motion for summary judgment (Dkt. 30) on all counts of the complaint. For the reasons stated below, Defendants' motion is granted.

**BACKGROUND**

The facts, which are undisputed unless noted, are taken from the parties' Local Rule 56.1 statements but the Court has also considered the body-worn camera footage of the incidents from Officers Moriarty and Belmontez (Dkt. 34). Around 8:10 P.M. on November 4, 2022, Plaintiff was seated in the driver's side of his then-wife's Kia Sorento near 59 N. Francisco Avenue in Chicago, Illinois. (Pl.'s Resp. Defs.' SOF ("P-RDSOF") ¶¶ 4-5, Dkt. 39). The Individual Defendants were driving in an unmarked police vehicle. (P-RDSOF ¶¶ 5-6; Defs.' Resp. Pl.'s SOF ("D-RPSOF") ¶ 2, Dkt. 46). As they were approaching the Kia, Belmontez, who was driving, says he saw Plaintiff

pouring a liquid from the glass bottle on the ground from within the vehicle; however, that statement is disputed. (P-RDSOF ¶ 6) The parties agree that Plaintiff was holding a glass bottle but neither officers' body-worn camera footage actually shows Plaintiff pouring any liquid.[1] (P-RDSOF ¶ 6; D-RPSOF ¶ 14). DeMarcus Wilbur, the other individual at the scene, was standing outside the Kia on the passenger side holding a clear plastic cup containing a clear, yellowish-brown liquid. (P-RDSOF ¶¶ 15-16). The Individual Defendants exited their vehicle to investigate Plaintiff and Wilbur for drinking on the public way. (D-RPSOF ¶ 7).

As the officers were pulling up alongside the Kia, Plaintiff closed the driver's side door which had been slightly ajar.[2] (P-RDSOF ¶ 8). Moriarty exited the police vehicle and quickly opened Plaintiff's door and ordered him out of the car; Plaintiff immediately complied. (P-RDSOF ¶ 8). Upon exiting the vehicle, Plaintiff placed a glass bottle with a "Pure" orange juice label on the ground. (D-RPSOF ¶ 17). Plaintiff was never seen drinking inside or outside the vehicle, and Belmontez testified that he did not smell liquor near the car. (*Id.* ¶¶ 19-22). Belmontez walked over to Wilbur and told him that he was being detained for drinking on the public way. (D-RPSOF ¶ 7).

While Plaintiff and Wilbur were handcuffed together, Plaintiff threw his car keys to his cousin, who was also present at the scene, to deny the officers entry into the Kia. (P-RDSOF ¶ 18). Belmontez shined his flashlight into the tinted windows of the locked vehicle, observing what he believed to be a marijuana blunt and an open bottle of alcohol. (*Id.* ¶ 17). Eventually, Belmontez gained entry to the Kia, where the objects—both in the middle compartment and cupholder of the

---

[1] The videos do depict a wet spot on the ground outside the driver's side door but the source of that moisture is not clear since the camera footage captures the Individual Defendants in their vehicle and then Plaintiff's actions as they are pulling up adjacent to but slightly behind the parked Kia.

[2] In the video, it appears that the Kia is parked at the curb but it is not clear if the car is on or off. But that fact is not material to the discussion.

vehicle—were confirmed to be cannabis and an open container of alcohol. (*Id.* ¶¶ 20-21). Belmontez also recovered a firearm from the vehicle's center console. (*Id.* ¶ 22). Plaintiff was arrested for possession of the firearm, unlawful use of cannabis, and drinking on the public way. (*Id.* ¶ 24).

Plaintiff, who was a convicted felon at the time of the arrest, was indicted and later arraigned on charges of armed habitual criminal, possession of a firearm by a convicted felon, and aggravated unlawful use of a weapon with a previous conviction. (*Id.* ¶¶ 25-27). On November 14, 2023, following a hearing in Plaintiff's criminal case on his motion to quash arrest and suppress evidence of the recovered firearm, the state court judge granted the motion. (*Id.* ¶¶ 28-29; *see generally* Exs. to Defs.' SOF, Dkt. 36-11, Ex. 12 ("Suppression Hr'g Tr.")). About a year later, on November 29, 2024, the state dismissed Plaintiff's underlying criminal case *nolle pros*. (P-RDSOF ¶ 38).

## LEGAL STANDARD

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704-05 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

The party seeking summary judgment has the initial burden of demonstrating the "absence

of evidence to support the non-moving party's case." *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If this burden is met, the opposing party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

## DISCUSSION

Plaintiff filed this lawsuit raising three federal claims—false arrest (Count I); unlawful detention (Count II); and malicious prosecution (Count III)—and three state law claims—malicious prosecution (Count V), and indemnification (Count VI).[3] Defendants have moved for entry of summary judgment in their favor on all counts of the complaint. The outcome of their motion hinges on whether the Individual Defendants had probable cause to search and arrest Plaintiff. If probable cause (or even arguable probable cause) existed, Defendants contend that all of Plaintiff's claims fail, including because Individual Defendants would be shielded by qualified immunity, but if a material factual dispute remains on that point, then Plaintiff's claims must be decided by a jury.

Defendants correctly point out that "[p]robable cause 'is an absolute defense' to [a plaintiff's] § 1983 claims" for false arrest and unlawful detention. *Lee v. Harris*, 127 F.4th 666, 672 (7th Cir. 2025) (quoting *Navratil v. City of Racine*, 101 F.4th 511, 518 (7th Cir. 2024)). The same is true for a false arrest claim under Illinois law. *See McBride v. Grice*, 576 F.3d 703, 706-707 (7th Cir. 2009). Probable cause also bars state and federal § 1983 claims for malicious prosecution. *Smith v. City of Chicago*, No. 23 C 5121, 2024 WL 3757127, at *3 (N.D. Ill. Aug.

[3] Plaintiff sued for false arrest and wrongful imprisonment (Count IV), but has since abandoned that claim as time-barred. (*See* Pl.'s Resp. Opp. Defs.' Mot. at 327 ("Pl.'s Opp."), Dkt. 43).

12, 2024) (citing *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006)) (federal law); *Holmes v. Vill. of Hoffman Est.*, 511 F.3d 673, 682 (7th Cir. 2007) (state law).

Plaintiff primarily contends in opposing summary judgment that there could not have been probable cause to arrest him because there was no reasonable articulable suspicion to even temporarily detain him to investigate drinking on the public way. He echoes points that Circuit Court Judge Laura Ayala-Gonzalez focused on at the November 2023 suppression hearing, where she quashed the arrest as unlawful. (*See generally* Suppression Hr'g Tr.). Indeed, the probable cause analysis for the search and arrest necessarily begins with the question of whether the Individual Defendants had reasonable articulable suspicion that Plaintiff was consuming alcohol on the public way—the ostensible rationale for their initial stop.

## I. Reasonable Articulable Suspicion

This inquiry requires focusing on the window of time during which and immediately after the officers initially saw Plaintiff and when Plaintiff was detained as Moriarty opened Plaintiff's vehicle's door and ordered him to exit the vehicle. The Court finds that the undisputed facts demonstrate that the Individual Defendants had reasonable suspicion to perform an investigatory stop of Plaintiff.

Even a brief police detention to investigate criminal activity is a seizure under the Fourth Amendment and therefore must be reasonable. *United States v. Wilson*, 963 F.3d 701, 703 (7th Cir. 2020). Officers may not lawfully initiate an investigatory stop—often called a *Terry* stop after *Terry v. Ohio*, 392 U.S. 1 (1968)—unless they have "reasonable suspicion that a crime occurred." *United States v. Booker*, 579 F.3d 835, 838 (7th Cir. 2009). That reasonable suspicion must be based on "specific and articulable facts" that suggest criminality, *United States v. Tilmon*, 19 F.3d

1221, 1224 (7th Cir. 1994) (cleaned up), not on "a mere hunch," *Navarette v. California*, 572 U.S. 393, 397 (2014) (cleaned up).

This bar is lower than probable cause. *See Alabama v. White*, 496 U.S. 325, 330 (1990) (noting that reasonable articulable suspicion "can be established with information that is different in quantity or content than that required to establish probable cause"). Courts do not "demand scientific certainty" but must permit officers to make "commonsense judgments and inferences about human behavior." *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000); *see also Navarette*, 572 U.S. at 403 (noting that an officer "'need not rule out the possibility of innocent conduct'" (quoting *United States v. Arvizu*, 534 U.S. 266, 277 (2002))).

Indeed, sometimes mistakes are made. Where an officer temporarily detains a suspect based on a mistake of law, the stop is unjustified. *See United States v. Tyler*, 512 F.3d 405, 411 (7th Cir. 2008) ("[W]e have held that a mistake of law (as opposed to a mistake of fact) cannot justify an investigative detention."). But reasonable mistakes of fact can still give rise to suspicion sufficient to justify a *Terry* stop. *See United States v. McDonald*, 453 F.3d 958, 962 (7th Cir. 2006) ("When an officer makes a stop based on a mistake of *fact*, we ask only whether the mistake was reasonable.").

This is not to suggest that an officer has unfettered discretion in determining when to detain a suspect to investigate. Like all seizures, "[t]he officer's action must be 'justified at its inception.'" *Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cnty.*, 542 U.S. 177, 185 (2004) (quoting *United States v. Sharpe*, 470 U.S. 675, 682 (1985)). And after the suspicious circumstances prompting the stop are eliminated, the stop must end. *Taylor v. Schwarzhuber*, 132 F.4th 480 (7th Cir. 2025) ("Even one second of continued detention after an unlawful stop is too long."). In

short, "[t]he standard takes into account the totality of the circumstances—the whole picture." *Navarette*, 572 U.S. at 397 (internal quotation marks omitted).

Defendants argue that Plaintiff points only to "self-serving statements" and marginal contradictions between Belmontez's and Moriarty's statements to support his contention that a reasonable articulable suspicion for the initial stop did not exist. (Defs.' Reply ISO Mot. Summ. J. at 333-334, Dkt. 45). Plaintiff maintains that the stop was never justified. (Pl.'s Opp. at 315-317). Such an unjustified stop would undermine probable cause for his arrest and likely raise questions of whether a reasonable jury could find in his favor, thereby precluding summary judgment for Defendants.

The trial court's rationale for quashing Plaintiff's arrest warrants a closer look. Reviewing that hearing transcript, the Court notes that she quashed Plaintiff's arrest in the underlying criminal case because she found the initial stop problematic. She reasoned that Moriarty "just goes straight and opens [Plaintiff's] car door" without announcing his presence as a police officer. (Suppression Hr'g Tr. at 264-265). She found concerning that Moriarty opened the door without seeing Plaintiff outside or inside the car with any alcohol, without smelling alcohol, and with no confirmation that Plaintiff was drinking on the public way. (*Id*.). Basically, she determined that because Moriarty did not announce that he was police officer when he initiated the stop and "had already made up his mind right there and then that he was going to find evidence of drinking on the public way," the stop was defective and tainted the entire criminal proceeding. (*Id*. at 265).

While the state court judge's perspective and conclusions from the criminal suppression hearing are relevant, this Court takes a different view of the circumstances prompting and maintaining the stop for purposes of a federal civil lawsuit. Regarding the officers' initial approach of the vehicle, Plaintiff expands on the suppression hearing holding and points to "discrepancies"

between Belmontez's and Moriarty's testimony regarding what they could see Plaintiff and Wilbur doing when the officers approached the car. (Pl.'s Opp. at 316-317).

But as Defendants accurately state, both officers do not need to see everything that potentially gives rise to reasonable articulable suspicion. "[T]he knowledge of one officer can be imputed to the other officers under the collective knowledge doctrine" when "law enforcement officers are in communication regarding a suspect . . . ." *United States v. Lyons*, 733 F.3d 777, 782 n.1 (7th Cir. 2013). Here, the suppression hearing testimony confirms that Belmontez and Moriarty "made observations" to "further investigate the open alcohol" and "maintain[ed] communication between each other" in the moments leading up to the stop. (Suppression Hr'g Tr. at 218-219). Moreover, it is undisputed that at least one of the officers saw Wilbur standing next to the vehicle that Plaintiff was seated in while holding a plastic cup containing a yellowish-brown liquid. It is also undisputed that one or both officers saw Plaintiff himself at least holding a glass bottle, and that Plaintiff closed the door of his vehicle as the officers' vehicle approached his car. Moreover, even though only one officer saw (or thought he saw) Plaintiff holding or pouring a bottle possibly containing alcohol, the collective knowledge doctrine means this could provide further justification for the stop because the officers were communicating with one another about the suspected criminality. In short, the Individual Defendants each observed "specific and articulable facts" suggesting that Plaintiff and Wilbur may be drinking on the public way. *Tilmon*, 19 F.3d at 1224.

Still, Plaintiff maintains that once Moriarty observed that the glass bottle Plaintiff was holding was orange juice, not a liquor bottle, the reasonable suspicion of criminality was gone, and Plaintiff's detention should have immediately ceased. (Pl.'s Opp. at 317). By maintaining the stop, Plaintiff suggests that the officers were projecting their suspicion of Wilbur for drinking on

the public way onto Plaintiff. (*Id.*). This, Plaintiff argues, renders the stop further unlawful as it is well-settled that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." (*Id*. (quoting *United States v. Segoviano*, 30 F.4th 613, 622 (7th Cir. 2022)).

The case Plaintiff cites, *Segoviano*, paints a factually distinct picture from the scenario presented here. There, federal agents entered an apartment building where they believed a fugitive was located. *Segoviano*, 30 F.4th at 616-618. The agents detained that plaintiff and searched his specific apartment, where eventually drugs were found, before he was arrested. *Id*. at 617. The Seventh Circuit explained that the "only connection to the facts known to the agents" between that plaintiff and the fugitive was the plaintiff's "residence in the [same] building." *Id*. at 623. This generalized suspicion based on being in the same building was not sufficient to justify a stop. *Id.*

In contrast, Defendants' suspicion here was not based solely on Plaintiff's general "proximity" to Wilbur. At minimum, the officers observed both Plaintiff and Wilbur, in or next to the same car, at night, where Wilbur was indisputably drinking alcohol on the public way and Plaintiff was holding a glass bottle containing an orange liquid, which Belmontez thought he saw Plaintiff pour liquid into or from. The Individual Defendants' suspicion was that Plaintiff was "not simply proximate to criminal activity but [was] a participant in it." *United States v. Richards*, 719 F.3d 746, 757 (7th Cir. 2013).

Other factors impact the broader analysis too. While a suspect's nervous action cannot, by itself, justify a stop, it "may contribute to reasonable suspicion because it is 'frequently recognized as a sign that a suspect has something to hide, including a weapon.'" *See United States v. Colbert*, 54 F.4th 521, 529 (7th Cir. 2022) (quoting *United States v. Patton*, 705 F.3d 734, 740 (7th Cir. 2013)); *see also United States v. Grogg*, 534 F.3d 807, 810 (7th Cir. 2008) ("While certain

[nervous] behavior in isolation may have an innocent explanation, that same behavior, when viewed in the context of other factors at play, may amount to reasonable suspicion."). Here, as the officers drove up next to his vehicle, Plaintiff closed his door. And after Plaintiff protested about Moriarty opening his door and attempting to search his vehicle, Plaintiff threw his keys to his cousin who arrived outside moments later and she concealed them in her pants as Plaintiff "beg[an] yelling at the officers. . . . pulling his arms away. . . . [and] call[ing] another individual [which] create[ed] less security in the situation." (Suppression Hr'g Tr. at 258). Even the officers and Plaintiff's wife (whom he had called on his cellphone) can be heard on the videos pleading with him to calm down. In short, Plaintiff's reaction escalated the situation to the point where his cousin was then detained for refusing to cooperate and more police officers had to be called to the scene. Considering the entire interaction, no reasonable jury would find the Individual Defendants' suspicions and resulting responses unreasonable.

Even assuming that the contents of the bottle were orange juice—which simply observing a label could not definitively confirm—an officer at the scene making a "commonsense . . . inference[]" could infer the bottle may contain alcohol too. *See Wardlow*, 528 U.S. at 125. At the very least, mistaking orange juice for alcohol under the circumstances would be a reasonable mistake of fact that would not render the stop unlawful. *See McDonald*, 453 F.3d at 962. In short, "the whole picture" here could lead an officer to reasonably suspect criminality such that a stop was justified. *Navarette*, 572 U.S. at 397 (internal quotation marks omitted).

## II. <u>Probable Cause</u>

Because the initial stop was justified, the next step is determining whether the officers had probable cause to detain and arrest Plaintiff based on the totality of the circumstances. Here, the undisputed evidence in the record shows that Defendants did.

"Probable cause to arrest exists 'when the facts and circumstances that are known to [the officer] reasonably support a belief that the individual has committed, is committing, or is about to commit a crime." *Braun v. Village of Palatine*, 56 F.4th 542, 548 (7th Cir. 2022) (quoting *Holmes*, 511 F.3d at 679). It "is not a high bar," *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (citing *Kaley v. United States*, 571 U.S. 320, 338 (2014)), and "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity[,]" *id.* (citing *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983)).

Shortly after stopping Plaintiff and Wilbur for suspicion of drinking on the public way, Belmontez shined his flashlight into Plaintiff's vehicle and observed in the center console what appeared to be an open bottle of alcohol and a marijuana blunt. Section 8-4-030(a)(1) of the Chicago Municipal Code makes it "unlawful for any person to drink any alcoholic liquor as defined by law on any public way." The Municipal Code defines "public way" as "any sidewalk, street, alley, highway or other public thoroughfare." Municipal Code of Chicago § 1-4-090(f). And 625 ILCS 5/11-502.15 makes it illegal for a driver to use cannabis in a vehicle, or possess cannabis in a vehicle that is not secured in a sealed or resealable, odor-proof, child-resistant cannabis container that is inaccessible.

Plaintiff argues that the plain view doctrine, under which Defendants observed the open bottle of alcohol and marijuana in Plaintiff's car, did not apply because Defendants' "initial approach and seizure of [Plaintiff] were unconstitutional." (Pl.'s Opp. at 319). In addition, Plaintiff

asserts, because Moriarty testified he did not *know* the open bottle was an alcohol bottle, and Belmontez only *confirmed* that the blunt contained cannabis once he searched the car, this "does not meet the standard for plain view." (*Id*. at 320 (quoting *United States v. Brown*, 79 F.3d 1499, 1509 (7th Cir. 1996))

Both arguments are wrong. Plaintiff's first contention mirrors his arguments concerning reasonable articulable suspicion that the Court already addressed and rejected above. Second, requiring that an officer have beyond-a-doubt confirmation of an object's identity before detaining and arresting a suspect where he or she reasonably believes the object is illegal would impose a higher standard than probable cause demands. *See Village of Palatine*, 56 F.4th at 548 ("Probable cause [must be] *reasonably* support[ed by] a belief that the individual has committed, is committing, or is about to commit a crime." (emphasis added)). The emphasis is on the reasonable viewpoint of an objective police officer. Coupled with the circumstances giving rise to the Individual Defendants' suspicion to stop Plaintiff and Wilbur discussed above—Plaintiff's glass bottle with an unknown liquid, Wilbur's plastic cup with liquor, Plaintiff closing the door and acting nervously—the open bottle and suspected marijuana in Plaintiff's center console that the officer observed provided "reasonable support" that violations of Municipal Code of Chicago § 1-4-090(f) and 625 ILCS 5/11-502.15 were underway to support probable cause.

Plaintiff further contends that Defendants lacked probable cause to arrest him for illegal possession of the firearm, which was recovered when Defendants opened the vehicle and searched the center console. (Pl.'s Opp. at 320-321). Illinois law forbids any person that has been previously convicted of a felony from possessing any firearm on or about his person. *See* 720 ILCS 5/24-1.1(a). The possession element can be satisfied by actual or constructive possession. *United States*

*v. Garrett*, 903 F.2d 1105, 1110 (7th Cir. 1990). Plaintiff's probable cause challenge relies on the unlawfulness of the initial stop, which the Court has already found is not established on this record.

Plaintiff also insists that "because there is no evidence that [he] ever knew about let alone handled the firearm in question," summary judgment cannot be granted. (Pl.'s Opp. at 321). But that is not correct. "Constructive possession exists when a person . . . knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others . . . . " *United States v. Kitchen*, 57 F.3d 516, 520 (7th Cir. 1995). And it "may be proved by direct or circumstantial evidence. *Garrett*, 903 F.2d at 1110 (quoting *United States v. Taylor*, 728 F.2d 864, 868 (7th Cir.1984)). In fact, it is often established by showing that a suspect had "[e]xclusive control over the premises." *United States v. Griffin*, 684 F.3d 691, 695 (7th Cir. 2012). From there, "the knowledge and intent to control objects within those premises" is inferred. *Id*.

That said, simple proximity to a firearm "without more, is not enough to support a finding of constructive possession." *United States v. Morris*, 576 F.3d 661, 666 (7th Cir. 2009). But "proximity coupled with other factors—including connection with an impermissible item, proof of motive, a gesture implying control, evasive conduct, or a statement indicating involvement in an enterprise" can show constructive possession. *United States v. Scott*, 150 F.4th 929, 934 (7th Cir. 2025) (internal quotation marks omitted).

Here, Plaintiff was the only person the Individual Defendants saw in the Kia. Significantly, as the body-worn camera footage confirms, Plaintiff exited the vehicle as ordered but slammed the door shut and locked it with the key fob, repeatedly warned the officers that they did not have permission to search *his* car, and to prevent them from removing the keys out of his hand, he threw them to his cousin for safekeeping. (P-RDSOF ¶ 23; P-RDSOF ¶ 18 ("Plaintiff threw his car keys

to his cousin while on scene in an effort to deny the defendants entry to the vehicle" Answer: "Undisputed.")). Such "evasive conduct" suggests constructive possession too. *Scott*, 150 F.4th at 934. A reasonable jury could find the Individual Defendants had probable cause to believe that Plaintiff had exclusive control over the vehicle where the firearm was found, and thus he constructively possessed the weapon such that probable cause existed to arrest him for unlawful possession by a felon.

In sum, Defendants had probable cause to arrest and detain Plaintiff on the alcohol, cannabis, and firearm related offenses. As Defendants note, a grand jury indictment, like Plaintiff's in the underlying criminal case in Cook County Court, is *prima facie* evidence of probable cause. *Lee*, 127 F.4th at 672. While not dispositive, it aids in confirming the Court's analysis here.

## III. Qualified Immunity

The Individual Defendants also argue that they are entitled to summary judgement because they are shielded by qualified immunity. "Qualified immunity protects public servants from liability for reasonable mistakes made while performing their public duties." *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013) (citing *Denius v. Dunlap*, 209 F.3d 944, 950 (7th Cir. 2000)). "To defeat a defense of qualified immunity, the plaintiff must show two elements: first, that the facts show 'a violation of a constitutional right,' and second, that the 'constitutional right was clearly established at the time of the alleged violation.'" *Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019) (quoting *Gill v. City of Milwaukee*, 850 F.3d 335, 340 (7th Cir. 2017)). Second, the plaintiff must "show either a reasonably analogous case that has both articulated the right at issue and applied it to a factual circumstance similar to the one at hand or that the violation was so obvious that a reasonable person necessarily would have recognized it as a violation of the law." *Id.* (internal quotation marks omitted) (quoting *Howell v. Smith*, 853 F.3d 892, 897 (7th Cir.

2017)). "[L]ower courts have discretion to decide which of the two prongs of [the] qualified-immunity analysis to tackle first." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

The qualified immunity analysis in the instant case begins and ends with the first prong. No reasonable jury could find a constitutional violation in light of the probable cause (even arguable probable cause) to arrest and detain Plaintiff that existed. Accordingly, the Individual Defendants are entitled to qualified immunity.

## IV. Indemnification

The only remaining count is for indemnification against the City. This claim rises and falls with the other claims under 745 ILCS 10/2-109. (Defs.' Mem. ISO Mot. Summ. J. at 105 n.1, Dkt. 32). That statute explains that "[a] local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable." 745 ILCS 10/2-109. Because Plaintiff does not contest this point, the City is entitled to summary judgment.

## CONCLUSION

For all the foregoing reasons, Defendants' motion for summary judgment is granted.

**DATED**: September 30, 2026

**ENTERED**:

LaShonda A. Hunt

LASHONDA A. HUNT
United States District Judge